# Exhibit A

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
00-CV-722(JMR/FLN)

| | | |
|---|---|---|
| Clarinda Color LLC<br><br>v.<br><br>BW Acquisition Corp., Beowulf Ltd., and Brian Nelson<br><br>v.<br><br>Wulf Management Corp., Mark Nelson, and Great Graphx.com | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | ORDER |

Plaintiff seeks summary judgment on its Amended Petition to Avoid Fraudulent Transfers and Enforce Constructive Trust. The Court, sua sponte, considered its own continuing subject matter jurisdiction in light of Peacock v. Thomas, 516 U.S. 349 (1996), and referred the matter to the Honorable Franklin L. Noel, United States Magistrate Judge, for Report and Recommendation. The Magistrate Judge recommended that certain counts of the Amended Petition be dismissed without prejudice due to lack of subject matter jurisdiction. Plaintiff filed timely objections to the Report and Recommendation pursuant to Local Rule 72.1.

Based upon a de novo review of the record herein, the Court adopts the Magistrate's Report and Recommendation, and dismisses certain claims without prejudice.

The Court further considers plaintiff's motion for summary judgment, and having done so, concludes plaintiff is entitled to

summary judgment on its remaining claims.

I. Background

The facts set forth herein are either undisputed or considered in the light most favorable to defendants.

This contract matter was initially brought by plaintiff, Clarinda Color LLC ("Clarinda"), in March, 2000. Clarinda sued defendants BW Acquisition Corporation ("BWAC"), Beowulf Ltd., and Brian Nelson, seeking damages of $500,000. Plaintiff and defendants compete in the pre-press printing business. The underlying dispute arose when Clarinda sold its business to BWAC. At all times relevant herein, Brian Nelson was the president, director, and sole shareholder of BWAC.

On August 1, 2000, five months after the complaint was filed, BWAC sold $1,645,000 worth of equipment, inventory, and accounts receivable to Wulf Management Company ("Wulf"), a new company formed by Mr. Nelson who was the company's president, director, and sole shareholder. (Brian Nelson Deps. 8/28/01 at 34, and 12/30/02 at 30-31, 69.) Mr. Nelson acknowledges that "substantially all" of BWAC's assets were transferred to Wulf. (Brian Nelson Deps. 8/28/01 at 23, and 12/30/02 at 50-52; Pl. Ex. 14 at 1.) Wulf contractually agreed to pay the full amount, but actually paid BWAC no more than $750,000. (Compare Pl. Ex. 14 with Brian Nelson Dep., 8/28/01 at 9-10, 34-35).

The purchase agreement did not disclose the fact that Highland

Bank held a security interest in BWAC's assets, based on the Bank having provided BWAC $750,000 to buy plaintiff's business. The value of Highland Bank's interest in August 2000 is disputed; defendants claim the full $750,000 was owed, while plaintiff has provided evidence showing that the remaining balance -- reflecting the only consideration BWAC received from Wulf -- was $73,268.34. (Compare Nelson Affidavit 2/27/03 at ¶ 3 with Hofland Dep. at 13-15, and Plaintiff's Ex. 21, referenced below.) The record does not disclose whether Highland Bank filed any UCC financing statement to perfect its security interest in BWAC's assets.

After the transfer, BWAC had at most $20,000 in assets, and ceased all business operations. Everything else had been transferred to Wulf, which took over BWAC's business at the same location, using the same equipment, employing the same staff, and servicing the same customers. No notice of the transaction was given to BWAC customers, employees, creditors, or to the Court. (Brian Nelson Deps. 8/28/01 at 23-24, and 12/30/02 at 50-51, 88; Donald Kellett Dep. 3/10/03 at 17-22, 30-31.)

On August 15, 2000, Wulf borrowed funds from ACRO Corporation to finance its purchase of BWAC, pledging BWAC's assets as collateral. On August 18, 2000, Mr. Nelson, acting as Wulf's president, directed ACRO to pay $275,000 to Highland Bank. (Pl. Ex. 20.) Highland Bank used the funds to pay off the $73,268.34 balance on BWAC's loan, and released its lien on the assets of

BWAC. (Pl. Ex. 21.)

Some months later, the parties' contract dispute was tried to a jury in this Court. The jury rendered judgment in favor of Clarinda in the amount of $401,872.82. On May 2, 2001, the Court entered judgment for that amount in favor of plaintiff and against defendant BWAC, in the absence of any indication of the transfer to Wulf. The jury declined to find Brian Nelson individually liable. In the course of trying to collect its judgment, plaintiff discovered the August, 2000, transfers recounted above.

In January, 2002, Wulf ceased doing business, and allowed yet another company -- Great Graphx.com ("Great Graphx"), owned and run by Brian Nelson's brother Mark -- to use the pre-press equipment in return for making payments on the ACRO loan. In November, 2002, plaintiff sought and received permission from this Court to bring a Petition to Avoid Fraudulent Transfers against Wulf, Mark Nelson, and Great Graphx as it attempted to collect its judgment against BWAC.

Plaintiff now seeks to recover its damages from the transferred assets.

II. <u>Analysis</u>

Summary judgment is appropriate when the evidence, viewed in the light most favorable to the nonmoving party, presents no genuine issue of material fact. Fed. R. Civ. P. 56; <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986); <u>Anderson v. Liberty Lobby,</u>

Inc., 477 U.S. 242, 246 (1986). The party opposing summary judgment may not rest upon the allegations set forth in its pleadings, but must produce significant probative evidence demonstrating a genuine issue for trial. See Anderson, 477 U.S. at 248-49; see also Hartnagel v. Norman, 953 F.2d 394, 395-96 (8th Cir. 1992). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson, 477 U.S. at 247-48 (emphasis omitted). If the opposing party fails to carry that burden, or fails to establish the existence of an essential element of its case on which that party will bear the burden of proof at trial, summary judgment should be granted. See Celotex, 477 U.S. at 322.

The counts of the Amended Petition over which this Court has jurisdiction claim BWAC fraudulently transferred its assets to Wulf (Counts I and II), which in turn transferred its assets to Great Graphx (Counts V and VI). Plaintiff claims both transactions constituted actual and constructive fraud under the Minnesota Uniform Fraudulent Transfer Act ("UFTA"), Minn. Stat. §§ 513.44 and 513.45 (2004), and urges the Court to impose a constructive trust upon the assets, whether held by Wulf (Count III) or Great Graphx (Count VII).

"There can be little question that federal courts generally

possess the power to protect their judgments by setting aside fraudulent conveyances of the judgment debtor." Thomas, Head & Griesen Employees Trust v. Buster, 95 F.3d 1449, 1453 (9th Cir. 1996), cert. denied, 520 U.S. 1116 (1997), citing Swift & Co. Packers v. Compania Colombiana Del Caribe, S.A., 339 U.S. 684, 694-95 (1950). To protect its judgment against BWAC, the Court retains jurisdiction to avoid any fraudulent transfer from BWAC to Wulf and any subsequent transfers, to attach the transferred assets, to enjoin further transfers, and to allow execution against the assets or their proceeds. Minn. Stat. § 513.47; see also Peacock v. Thomas, 516 U.S. at 356. Prior to taking such steps, however, the Court must first determine whether the initial transfer from BWAC was fraudulent.

1. Was BWAC's Transfer to Wulf Fraudulent?

a. Is there an "asset"?

A debtor may not transfer assets intending to hinder, delay, or defraud creditors. See Minn. Stat. §§ 513.41-513.51 (2004); New Horizon Enterprises, Inc. v. Contemporary Closet Design, Inc., 570 N.W.2d 12, 14 (Minn. Ct. App. 1997). However, property is not an "asset" under the statute to the extent it is encumbered by a valid lien. Minn. Stat. § 513.41(2)(i); In re Wintz Cos., 230 B.R. 848, 860 (B.A.P. 8th Cir. 1999); Lorenz Bus Serv., Inc. v. Richfield Bus Co., 2002 WL 2005468, *3 (Minn. Ct. App. Sept. 3, 2002) (unpublished). A valid lien is one effective against the holder of

a judicial lien subsequently obtained by legal or equitable process or proceedings. Minn. Stat. § 513.41(13).

Under the Uniform Commercial Code, a security interest in collateral is only enforceable against the debtor and third parties if value has been given. Minn. Stat. § 336.9-203(b)(1) (2004). To the extent the value of the property exceeds the value of the security interest, the excess is an "asset" subject to the UFTA. See Preferred Funding, Inc. v. Jackson, 61 P.3d 939, 942 (Or. App. 2003) (construing identically-worded Oregon statute).

Here, BWAC transferred property valued at $1,645,000 to Wulf through the asset purchase agreement dated August 1, 2000. As of August 18, 2000, Highland Bank represented to Brian Nelson that it had a $73,268.34 security interest in the transferred property based on the BWAC loan. The Court has not been given evidence establishing the precise loan balance as of August 1, the date of the transfer, nor is there evidence that any payments were made on the loan between August 1 and August 18.

Assuming without deciding that Highland Bank's lien is valid up to the value of its security interest, a jury could reasonably infer from uncontradicted evidence that BWAC transferred over $1.5 million in unencumbered assets to Wulf. (Indeed, even accepting defendants' assertion that Highland Bank's interest was $750,000, there would still be $895,000 in assets remaining.)

Accordingly, the Court finds defendants have failed to raise

a genuine issue of material fact as to whether BWAC transferred assets to Wulf. Clearly, it has done so. Although the precise amount might be in dispute, there were clearly assets sufficient to satisfy all or part of plaintiff's judgment against BWAC.

b. Did BWAC Defraud Plaintiff?

The Court finds there is no genuine issue of material fact on the question of whether BWAC intended to, or actually did, defraud plaintiff by transferring its assets to Wulf. To prevail on its claim, plaintiff need not prove that BWAC transferred the precise assets that gave rise to the jury's verdict. Rather, plaintiff need only prove that BWAC transferred some assets from which the judgment might have been satisfied, leaving BWAC insolvent and putting the assets beyond the reach of creditors.

1. Actual Fraud

Under Minnesota law,

> A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation . . . with actual intent to hinder, delay or defraud any creditor of the debtor.

Minn. Stat. § 513.44(a)(1) (2004).

When assessing a debtor's intent under UFTA, "[t]ransactions involving corporations and their executives or corporations under the common control of the same officers and directors are to be regarded with skepticism by the courts and closely scrutinized." Snyder Elec. Co. v. Fleming, 305 N.W.2d 863, 867 (Minn. 1981),

citing Swanson v. Tomlinson Lumber Mills, Inc., 239 N.W.2d 216, 221, n.3 (Minn. 1976).

The Court can consider the presence of "badges of fraud" as it seeks to determine the existence of fraudulent intent. See Brown v. Third Nat'l Bank (In re Sherman), 67 F.3d 1348, 1353 (8th Cir. 1995). The Court may refer to the Minnesota UFTA's codification of a number of these "badges of fraud." In re Curry, 160 B.R. 813, 818 (Bankr. D. Minn. 1993), citing Minn. Stat. § 513.44(b). While one badge of fraud does not establish fraudulent intent, the presence of several "can constitute conclusive evidence of an actual intent to defraud, absent significantly clear evidence of a legitimate supervening purpose." Brown, 67 F.3d at 1354 (internal quotation omitted).

Here, the Court finds the transfer from BWAC to Wulf bears unmistakable badges of fraud. As defendants admit, BWAC transferred its assets to another company owned by BWAC's president, Brian Nelson. Mr. Nelson established Wulf only shortly before the transfer. See Snyder, 305 N.W.2d at 867; Minn. Stat. § 513.44(b)(1). Brian Nelson was president, director and sole or controlling shareholder of both BWAC and Wulf, so BWAC retained control of the property it transferred to Wulf. §§ 513.44(b)(1), (2).

BWAC never disclosed the transfer to its customers, employees, or creditors. § 513.44(b)(3). The transfer, which occurred a mere

five months after plaintiff's complaint was filed, was neither disclosed to plaintiff nor to the Court. §§ 513.44(b)(4), (10). The transfer involved "substantially all" of BWAC's assets, leaving BWAC insolvent. §§ 513.44(b)(5), (9); Swanson, 239 N.W.2d at 221. Finally, although the stated value of the property exceeded $1.6 million, Brian Nelson testified that Wulf paid BWAC no more than $750,000 for it. § 513.44(b)(8).

Based on this evidence, no jury could reasonably find other than that the transfer was designed only to fraudulently place assets beyond the reach of the Court and of BWAC's potential judgment creditor.

2. Constructive Fraud

A plaintiff may also prove a transfer was constructively fraudulent. Plaintiff has done so concerning the transfer from BWAC to Wulf. Minnesota law provides:

> A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

Minn. Stat. § 513.45(a) (2004). Therefore, constructive fraud requires proof of (1) a transfer; (2) a prior claim; (3) no "reasonably equivalent value"; and (4) debtor insolvency. As noted above, the undisputed evidence would oblige a jury to find that plaintiff had established each of these elements.

Defendants have been wholly unable to demonstrate that Wulf took in good faith for value, see Minn. Stat. § 513.48. They have offered no evidence of a legitimate supervening purpose for the BWAC transfer. Defendants merely urge the Court to ignore plaintiffs' evidence while offering nothing to contradict it or challenge its accuracy. This hardly constitutes the establishment of an issue of material fact for trial by defendants. Accordingly, summary judgment is proper on these claims as well.

The UFTA is designed to prevent debtors from putting their property which would be otherwise available for payment of debts beyond the reach of their creditors. In re Wintz Cos., 230 B.R. at 859; Shields v. Goldetsky (In re Butler), 552 N.W.2d 226, 232 (Minn. 1996). As seen above, there are sufficient badges of fraud to conclude as a matter of law that BWAC fraudulently transferred property to Wulf in an attempt to prevent plaintiff from collecting its judgment. The transfer is thus avoidable, and must be recovered on behalf of plaintiff from Wulf and all subsequent transferees.

Since we have found the transfer fraudulent, the assets are -- and were from the time of the fraud -- in a constructive trust for the benefit of plaintiff. Successive transfers are therefore void.

III. Conclusion

Accordingly, IT IS ORDERED that:

1. The Magistrate's Report and Recommendation is adopted.

[Docket No. 106]

2. Counts IV and VIII of the Amended Petition are dismissed without prejudice. [Docket No. 83]

3. Counts I, II, V and VI are dismissed to the extent plaintiff seeks to make Wulf and Great Graphx directly liable for the judgment against BWAC in excess of, or in addition to, their liability as fraudulent transferees. [Docket No. 83]

4. Plaintiff's Motion to Amend the Prayer for Relief in its Summary Judgment Motion is granted. [Docket No. 109] This amendment is deemed an amendment to the prayer for relief in the Amended Petition as well.

5. Plaintiff's Motion for Summary Judgment is granted. [Docket No. 91]

6. The Court finds that the transfer of assets from BWAC to Wulf was fraudulent as to plaintiff, and hereby avoids the transfer. The transferred assets listed on Exhibit A to the Sale of Assets Agreement (Pl. Ex. 14), or their equivalent value in cash, are attached, and further transfer or use is hereby enjoined. Minn. Stat. § 513.47(a)(1),(2)(3). Plaintiff may levy execution on the assets transferred or their proceeds, whether in the hands of Wulf or Great Graphx, without further order of this Court. Minn. Stat. § 513.47(b).

7. Judgment is entered against Wulf in the amount of $401,872.82 as the first transferee of BWAC. Minn. Stat. § 513.48(b)(1). Wulf is ordered to immediately disgorge the assets it received from BWAC, or their equivalent value in cash, to the extent needed to satisfy plaintiff's judgment against BWAC.

8. A constructive trust is imposed upon the assets of Wulf, wherever located, up to the value of the judgment, for the benefit of plaintiff, until the plaintiff's judgment against BWAC is satisfied.

9. Great Graphx and any subsequent transferees are ordered immediately to cease using the assets and to disgorge the assets received from Wulf, or their equivalent value in cash, to the extent needed to satisfy plaintiff's judgment against BWAC.

10. Wulf and Great Graphx are hereby ordered to show cause on or before June 21, 2004, why they should not be divested of legal title to the pre-press equipment originally transferred from BWAC.

11. BWAC, Wulf, and Great Graphx shall file their corporate books and records with the Clerk of the Court forthwith.

12. Defendants shall make themselves available to the Court for subsequent proceedings forthwith.

IT IS SO ORDERED.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated: June 14, 2004

s/ James M. Rosenbaum
JAMES M. ROSENBAUM
United States District Judge

# Exhibit B

# UNITED STATES DISTRICT COURT
## District of Minnesota

Clarinda Color LLC

V.

BW Acquisition Corp, Beowulf Ltd., and Brian Nelson et al.

## JUDGMENT IN A CIVIL CASE

Case Number: 00-CV-722 JMR/FLN

☐ **Jury Verdict.** This action came before the Court for a trial by jury. The issues have been tried and the jury has rendered its verdict.

☒ **Decision by Court.** This action came to trial or hearing before the Court. The issues have been tried or heard and a decision has been rendered.

IT IS ORDERED AND ADJUDGED THAT:
1) The Magistrate's Report and Recommendation is adopted. 2) Counts IV and VIII of the Amended Petition are dismissed without prejudice. 3) Counts I, II, V and VI are dismissed to the extent plaintiff seeks to make Wulf and Great Graphx directly liable for the judgment against BWAC in excess of, or in addition to, their liability as fraudulent transferees. 4) Plaintiff's Motion to Amend the Prayer for Relief in its Summary Judgment Motion is granted. This amendment is deemed as amendment to the prayer for relief in the Amended Petition as well. 5) Plaintiff's Motion for Summary Judgment is granted. 6) The Court finds that the transfer of assets from BWAC to Wulf was fraudulent as to plaintiff, and hereby avoids the transfer. The transferred assets listed in Exhibit A to the Sale of Assets Agreement (P1. Ex. 14), or their equivalent value in cash, and further transfer of use is hereby enjoined. Minn. Stat. section 513.47 (a) (1) (2) (3). Plaintiff may levy execution on the assets transferred or their proceeds, whether in the hands of Wulf or Great Graphx, without further order of this Court. Minn. Stat. section 513.47(b). 7) Judgment is entered against Wulf in the amount of $401,872.82 as the first transferee of BWAC. Minn. Stat. section 513.48 (b) (1). Wulf is ordered to immediately disgorge the assets it received from BWAC, or their equivalent value in cash, to the extent needed to satisfy plaintiff's judgment against BWAC. 8) A constructive trust is imposed upon the assets of Wulf, wherever located, up to the value of the judgment, for the benefit of plaintiff, until the plaintiff's judgment against BWAC is satisfied. 9) Great Graphx and any subsequent transferees are ordered immediately to cease using the assets and to disgorge the assets received from Wulf, or their equivalent value in cash, to the extent needed to satisfy plaintiff's judgment against BWAC.

June 16, 2004
Date

RICHARD D. SLETTEN, CLERK

s/Jackie Mehl
(By) Jackie Mehl, Deputy Clerk

# Exhibit C

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
00-CV-722(JMR/FLN)

Clarinda Color LLC )
)
v. )
)
BW Acquisition Corp., Beowulf )
Ltd., and Brian Nelson ) ORDER
)
v. )
)
Wulf Management Corp., Mark )
Nelson, and Great Graphx.com )

On June 14, 2004 this Court granted summary judgment to plaintiff and ordered defendants Wulf Management Corp. ("Wulf") and Great Graphx.com ("Great Graphx") to show cause on or before June 21, 2004, why they should not be divested of legal title to certain pre-press equipment fraudulently transferred to them by defendant BW Acquisition Corp. ("BW Acquisition"). Based on the parties' responses, the Court finds that Wulf and Great Graphx should be divested of title.

Defendants rehash their previously rejected argument of the equipment being fully encumbered by a valid lien. Their argument is without substance, and is, again, rejected. The Court maintains its view that Highland Bank had a prior valid lien limited to the value of the unpaid BW Acquisition loan. The Court maintains its view that insofar as this equipment has a value in excess of the unpaid Highland Bank loan, that excess value is an asset of BW Acquisition subject to execution to satisfy plaintiff's judgment.

Accordingly, IT IS ORDERED that:

1. The Order of June 14, 2004 is amended to reflect Highland Bank's and ACRO Bank's ("ACRO") having filed financing statements to perfect their interests.

2. Having received assets of BW Acquisition as a result of fraud, Wulf and Great Graphx are divested of all right, title and interest in and to the pre-press equipment transferred by BW Acquisition on August 1, 2000, up to the value of plaintiff's judgment against BW Acquisition.

3. Legal title to this property shall forthwith be vested in BW Acquisition, which shall convey legal title therein to plaintiff as part of BW Acquisition's duty to satisfy plaintiff's judgment.

4. As ACRO is not a party to this matter and no motion is before the Court, the Court expressly declines to address questions concerning the validity or priority of ACRO's interest in the pre-press equipment.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated: July 9, 2004

s/ JAMES M. ROSENBAUM
JAMES M. ROSENBAUM
United States Chief District Judge

# Exhibit D

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
FOURTH DISTRICT

ORIGINAL

---------------------------------------------------

Clarinda Color, LLC,
Plaintiff,
vs. File No. 00-722 JMR/FLN
BW Acquisition Corporation,
Beowulf Ltd. and Brian Nelson,

Defendants,
vs.
Wulf Management Corporation,
Mark Nelson, and Great Graphx.com, Inc.

---------------------------------------------------

DEPOSITION OF
MARK NELSON
JANUARY 28, 2005
9:30 A.M.

REPORTED BY: CHRISTINA DE GRANDE

DEPOSITION OF MARK NELSON taken pursuant to Notice of taking of Deposition and taken before Christina M. De Grande, Professional Court Reporter and Ramsey County Notary Public, State of Minnesota, on the 28th day of January, 2005, in Minneapolis, Minnesota, and commencing at approximately 9:30 a.m.

APPEARANCES:

FREEBORN & PETERS
BY: Neal Levin, Attorney
311 South Wacker Drive, Suite 3000
Chicago, Illinois 60606
Phone: (312) 360-6000
Fax: (312) 360-6573
Appeared for Plaintiff

FREEBORN & PETERS LLP
BY: Paige Fitzgerald, Attorney
1905 East Wayzata Boulevard, Suite 220
Wayzata, Minnesota 55391
Phone: (952) 404-2100
Fax: (952) 404-2111
Appeared for Great Graphx.com, Inc.

ALSO PRESENT: Brian Nelson

INDEX

EXAMINATION PAGE
BY MR. LEVIN 5
DEPOSITION EXHIBITS PAGE
NO. 1 Amended Notice of Deposition 5
NO. 2 Profit and Loss Statements and Balance Sheets for Great Graphx 6
NO. 4 Bank Signature card 83
NO. 5 Bank Statements for account 5005644 88
NO. 10 ACRO document file 85
NO. 12 Community Bank promissory note 100
NO. 15 Summary of insurance 53
NO. 18 Individual Income Tax Returns 103
NO. 19 Personal Financial Statements 107
NO. 22 Money Market account statements 108
OBJECTIONS PAGE
BY MS. FITZGERALD 15, 43, 47, 48, 57, 63, 73, 76 78, 97, 112
REPORTER'S CERTIFICATE 114

WHEREUPON, the following proceedings transpired:

MARK NELSON,
a witness in the above-entitled action,
after having been first duly sworn,
deposes and says as follows:

EXAMINATION

BY MR. LEVIN:

Q. This is the amended deposition pursuant to Amended Notice of Mark Nelson, the captioned matter. And Mr. Nelson, I'm going to hand you or present to you the deposition binder for today and we'll reference all the exhibits by the tab numbers in the book. If you turn to tab 1, please, and to the third page of Exhibit 1 which is the Amended Notice of Deposition, third page, specifically. Have you seen this document before?
A. Yes.
Q. Did you review this document with your counsel?
A. Yes.
Q. And this rider asks for documents to be produced which the court ordered to be produced by the end of December which, with an agreement of your counsel, we extended the date to sometime last week. Is it your belief as we sit here today that you have

A. Well, ACRO is our asset base lender and we went over this last time, so --
MS. FITZGERALD: You can answer his question. Do you want to repeat it?
THE WITNESS: Yes. What was the question?
BY MR. LEVIN:
Q. I'll just ask again. Did they take any of your accounts receivable?
A. ACRO takes all of our accounts receivable.
Q. So all of your receivables are financed through ACRO?
A. Yes.
Q. So if I look at your financial statement as of year-end 2004 and I see accounts receivable, all of that money would have been paid to the lock box pursuant to your agreement with ACRO?
A. Yes.
Q. And is ACRO or Community National currently in the process of bringing any other claims against you or Great Graphx?
A. Not to my knowledge.
Q. Are you aware of any lawsuits pending against Great Graphx other than this lawsuit?
A. Not to my knowledge.

Q. What services were they providing?
A. Let's see. The driver drove.
Q. And which one was the driver?
A. Bernie.
Q. And where did Bernie drive?
A. Occasionally, to pick up a job or deliver a job.
Q. And how long after July 15th, 2004 did Bernie drive?
A. I don't know the exact date.
Q. Give me an approximate date.
A. Bernie showed up, virtually, to say "hello" to me every day. Bernie's 65, 64, something like that, and he didn't get paid.
Q. At all?
A. Towards the end.
Q. When was the last time he got paid?
A. I don't know that.
MS. FITZGERALD: Asked and answered.
BY MR. LEVIN:
Q. Where would that information be?
A. In my head.
Q. When Bernie got paid, was he paid with a check from Great Graphx?
A. No.
Q. He was paid cash?
A. He was paid a check. He was given a check.

Q. Who drew the check? Who drew the check?
A. I don't understand the question, "drew the check."
Q. Who wrote the check out to Bernie?
A. I did.
Q. From whose account?
A. From an account, on the advice of my attorney, we set up after you came in.
Q. Set it up with what money?
A. Money that ACRO gave to me.
Q. When was the last time ACRO gave you money?
A. I don't know the exact date.
Q. Approximately.
A. Last month, I suppose.
Q. How much did they give you?
A. I don't know. I don't remember.
Q. Did they give it to you personally?
A. No.
Q. Who did they give it to?
A. Well, what do you mean, to me personally?
Q. Who did they give the money to? Let's start with who was the payee on the check?
A. I don't -- I'm not sure how they -- I think my attorney was one of them.
Q. And where was the -- well, okay. Let's back up because you said they gave money to you. Are you

considering money to you being money that they paid directly to your attorney?
A. Say the question again.
Q. You've indicated that ACRO gave money to you. Are you considering money given to you to be money that was also give directly to your attorney?
A. Yes.
Q. Other than money they gave directly to your attorney, when was the last time ACRO gave money to you personally?
A. Not to me personally.
Q. You're saying they never gave money to you personally?
A. I don't -- you know, I'm -- I can't say they ever gave money to me personally, no.
Q. So you don't know whether or not they gave money to you personally?
A. No.
Q. No, that's incorrect, or no, you don't know?
A. No, I don't know.
Q. When was the last time they gave money to Great Graphx.com?
A. I don't know.
Q. So the only money that you can recall that was either given to you or Great Graphx.com or anyone

else was the money that was given to your attorney about a month ago?
A. That was the last, I believe.
Q. Do you know how much was given to your attorney?
A. Not exactly.
Q. Why did ACRO give money to your attorney?
A. I think you'd have to ask them.
Q. Do you know why ACRO gave money to your attorney?
A. To finance -- to help with my legal support here.
Q. Was that upon your request?
A. Yes. I would say that's true.
Q. Did anyone else participate in the request of ACRO to give money to your attorney to pay for the legal services in relation to these proceedings?
A. No.
Q. Was Brian in any way involved in the additional advances from ACRO to you or your attorney?
A. I -- indirectly, I suspect.
Q. Based on what knowledge do you say that?
A. I don't have any knowledge. I would say I'm sure that would be the case.
Q. How are you sure?
A. I don't know.
Q. But you're sure?
A. "Sure" is not a good word.

MR. LEVIN: Not to mention the fact that he's already testified that it was on the advice of counsel. All I'm doing is clarifying.

MS. FITZGERALD: Well, then asked and answered.

MR. LEVIN: All I'm doing is clarifying, Counsel.

BY MR. LEVIN:

Q. Is that correct?

MS. FITZGERALD: Don't answer the question.

MR. LEVIN: Despite the fact he's already answered it?

MS. FITZGERALD: It's on the record. What's on the record is on the record.

BY MR. LEVIN:

Q. Tell me where you opened this account that you referenced earlier.

A. Stearns Bank, S-t-e-a-r-n-s.

Q. When did you open the account?

A. I don't know the exact date.

Q. Was it after July of 2004?

A. Yes.

Q. And is the account in the name of Great Graphx?

A. No.
Q. Whose name is on the account?
A. I think we provided that information, but if not, Video Division, Inc.
Q. Video Division, Inc.?
A. Mm-hmm.
Q. Why did you open an account in the name of Video Division, Inc.?
A. To pay rent and so on.
Q. Why did you not pay rent out of the Great Graphx operating accounts?
A. Simply because it was being attacked by you and -- and others.
Q. So you shifted money out of one of your operating accounts to be able to open this account?
A. No.
Q. How did you fund the opening of the account?
A. Came through ACRO.
Q. ACRO gave you money to open this account?
A. They gave me permission to do it, yes.
Q. When you say "permission," my question still is who funded the opening of the account? Where did the money come from to make the initial deposit?
A. I personally did.
Q. You did?

A. Yes.
Q. How much money did you initially deposit in this new account?
A. I believe it was $100.
Q. Do you have the account number?
A. No.
MR. LEVIN: Counsel, do you know whether or not documents in relation to this new account for Video Division, Inc. were produced?
MS. FITZGERALD: I do not. Did you give them to me?
THE WITNESS: I'm sorry. What?
MS. FITZGERALD: Do you know if you gave them to me?
THE WITNESS: I don't know. I didn't hear what the question was.
MS. FITZGERALD: He's asking whether or not we produced account statements for Video -- Video Division, Inc.
THE WITNESS: No.
MS. FITZGERALD: Okay. We will produce those.
BY MR. LEVIN:
Q. Other than the initial $100 that you deposited into

the account, an account you say was opened to pay rent and other expenses after July of 2004, how else was the account funded?

A. The work that we -- that we, you know, did, and -- and that ACRO allowed us to put in there.

Q. Allowed you to put in there from where?

A. From our accounts receivable.

Q. So ACRO allowed you to take some of the accounts receivable that would have paid down their loan to put into this account to operate your business which you say as of July 2004 couldn't do business anymore?

MS. FITZGERALD: Objection. That mischaracterizes his testimony.

BY MR. LEVIN:

Q. Is that an incorrect statement?

A. Yes.

Q. Tell me where it is incorrect.

A. I don't know. Say it again. That's --

Q. Do you want to read it back, please?

(WHEREUPON, the requested portion was read.)

BY MR. LEVIN:

Q. What part of that statement is incorrect?

MS. FITZGERALD: For the record, my

objection still stands.
BY MR. LEVIN:
Q. What part of that statement is incorrect?
A. As I hear it, I think it's okay.
Q. And as of July 2004, according to the Balance Sheets that you produced for Great Graphx.com or Great Graphx, regardless of which one you look at, the approximate loan obligation to ACRO as of that date is approximately $800,000 outstanding; is that correct?
MS. FITZGERALD: Which document are you referring to?
MR. LEVIN: Great Graphx Balance Sheet for July 15, 2004.
MS. FITZGERALD: And that is Exhibit 2; is that correct?
MR. LEVIN: I wasn't referring to the exhibit specifically. I was just wondering whether or not Mr. Nelson knows what the loan obligation was to ACRO.
THE WITNESS: Approximately, yes.
BY MR. LEVIN:
Q. Since July 15th, 2004 when there was this approximate $800,000 still owing to ACRO, how much more money did ACRO advance to you, your counsel,

Great Graphx, or anyone else?
A. I don't know the exact number. We can get that for you.
Q. Okay. Are there documents that would show the amount of additional advances without actually having to go to ACRO?
A. No.
Q. So when you got additional advances, you didn't sign any other documents that would indicate a promise to repay these additional advances to ACRO?
A. They -- as you well know, ACRO has an accounting system so that if there's a request that comes in, it shows up on their monthly statement that day. And I think we provided those.
Q. Actually, you didn't.
A. Pardon me?
Q. Actually, you did not.
A. Then ACRO probably provided it to you.
Q. Actually, they have not, not for that time period.
A. Okay.
Q. So I'd like those.
MS. FITZGERALD: Do you have those in your possession?
THE WITNESS: I'm not sure because we'd have to get that from ACRO.

Q. Why didn't you just shut down? Why did you have to continue to pay rent?
A. Well, that's eventually what happened anyway.
Q. Well, at the time, why did you have to pay rent?
A. I'm a proud person.
Q. And how does that translate into you having to pay rent, because you feel morally obligated to pay obligations that are due?
A. No. You're stretching it now.
Q. Good. Because I wanted a piece of that action.
A. I knew where you were going with that. I'll buy you a beer next time I see you downtown.
Q. Do you want to tell me why it was that occurred in August or September of 2004?
A. I think I answered it.
Q. I didn't get the answer.
MS. FITZGERALD: Do you want it read back?
BY MR. LEVIN:
Q. No. He didn't answer that question. Why did ACRO fund money to you so that you just stop and pay the expenses in August or September of 2004?
A. They wanted me to survive.
Q. You said you couldn't survive because you didn't have the equipment?

A. That's not what I said. They wanted me to survive.
Q. How did they propose to do that with the equipment being gone that we had taken?
MS. FITZGERALD: Objection. Lack of foundation.
BRIAN NELSON: There was court stuff going on.
THE WITNESS: The big thing, once the equipment went to HFC, there was hope that we would be able to get it back and to continue to go, but as time went on, that -- and the auction was held online and an amount was -- a ridiculous amount was gotten on an online auction of two weeks. Then we realized that it's -- we'll have to work out a different plan.
BY MR. LEVIN:
Q. Do you have any personal knowledge as to why ACRO didn't just buy back the equipment for $25,000 instead of giving you money to pay at your discretion for expenses at Great Graphx?
A. We discussed it, but then we felt like you'd come right in and take it away from them again.
Q. Whose conclusion was that?
A. It wasn't mine.

Q. Whose conclusion was it?
A. I don't know.
Q. You said that "we felt that." Did you have a discussion with someone about it?
A. About what?
Q. You said, "We felt that Household would just come back and take the equipment again." Who's "we"?
A. ACRO and me.
Q. So you had a conversation about it?
A. Yes.
Q. Who came to that conclusion?
A. We did.
Q. Jointly between you and ACRO?
A. Yes.
Q. Who were you meeting with at ACRO when you came to this conclusion?
A. Two or three people.
Q. Tell me who they are.
A. Roger Bickel and Jack Hart.
Q. Jack Hart, the president?
A. Yes.
Q. Anybody else?
A. No.
Q. Was Brian there?
A. No.

Q. Other than the bank account at Stearns Bank, does Video Division, Inc. have any accounts or assets anywhere else?
A. No.
Q. Does Video Division, Inc. conduct any business other than cutting checks to pay for Great Graphx obligations?
A. No.
Q. Has Video Division, Inc. used any money from its bank account to pay anything other than Great Graphx-related expenses?
A. No, I don't believe so, to the best of my knowledge.
Q. Is any money paid out of Video Division, Inc. to you?
A. Yes.
Q. How much?
A. I don't know the exact amount. I can get that to you, or you'll get that with the --
Q. What was the basis for you taking money out of Video Division, Inc.'s bank account?
A. Survival.
Q. To pay personal expenses?
A. Yes. It's a repayment of the loan, you know.
BRIAN NELSON: Do you want to take a break?

STATE OF MINNESOTA )
) ss
COUNTY OF RAMSEY )

BE IT KNOWN THAT I, Christina M. De Grande, the undersigned, a duly commissioned and qualified notary public within and for the County and State aforesaid, do hereby certify that before the giving of his deposition, the said Mark Nelson was by me first duly sworn upon his oath to depose the whole truth and nothing but the truth; that the foregoing is a true and correct copy of my original stenotype notes taken at said deposition; that I am neither a relative of, nor attorney for, any of the parties to the cause and have no interest whatsoever in the result of the same; that the cost of the original has been charged to the party who noticed the deposition, and that all parties who ordered copies have been charged at the same rate for such copies.

WITNESS MY HAND AND SEAL this 7th day of February, 2005.

Christina Marie DeGrande
Notary Public
Minnesota
My Commission Expires Jan. 31, 2008

CHRISTINA M. DE GRANDE
Notary Public, Ramsey County, Minnesota

# Exhibit E

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
FOURTH DISTRICT

ORIGINAL

---------------------------------------------------

Clarinda Color, LLC,
Plaintiff,
vs. File No. 00-722 JMR/FLN
BW Acquisition Corporation,
Beowulf Ltd., and Brian Nelson,

Defendants,
vs.
Wulf Management Corporation,
Mark Nelson, and Great Graphx.com, Inc.

---------------------------------------------------

DEPOSITION OF
BRIAN NELSON
JANUARY 28, 2005
1:15 P.M.

DEPOSITION OF BRIAN NELSON taken pursuant to Notice of taking of Deposition and taken before Christina M. De Grande, Professional Court Reporter and Ramsey County Notary Public, State of Minnesota, on the 28th day of January, 2005, in Minneapolis, Minnesota, and commencing at approximately 1:15 p.m.

APPEARANCES:

FREEBORN & PETERS
BY: Neal Levin, Attorney
311 South Wacker Drive, Suite 3000
Chicago, Illinois 60606
Phone: (312)360-6000
Fax: (312)360-6573
Appeared for Plaintiff

# INDEX



| EXAMINATION | PAGE |
|---|---|
| BY MR. LEVIN | 5 |

| DEPOSITION EXHIBITS | MARKED |
|---|---|
| NO. 1 Amended Notice of Deposition | 23 |

| OBJECTIONS | PAGE |
|---|---|
| NONE | |



ALSO PRESENT: Mark Nelson

WHEREUPON, the following proceedings transpired:

BRIAN NELSON,
a witness in the above-entitled action,
after having been first duly sworn,
deposes and says as follows:

EXAMINATION

BY MR. LEVIN:

Q. State your full name, please.
A. It's Brian, middle initial is R. Last name is Nelson.
Q. And this is the deposition pursuant to Amended Notice in the captioned case. Would you state your current residence address.
A. 2400 Bryant Avenue South, Minneapolis, Minnesota 55405.
Q. Your current marital status?
A. I'm married.
Q. And your wife's name?
A. Diane.
Q. And what is your current employment?
A. I don't -- I'm unemployment.
Q. What was your last place of employment?
A. I was self-employed, I suppose you would say, managed various properties that I was an owner of, I

chair, a desk, and a picture, and things like that to try to compensate for some of the rent that was owed him.
Q. Did you give him anything that had a value of more than $500?
A. You know, based upon what you folks got at the auction, I hesitate to think that he got anything. Everything he got probably doesn't total 500 bucks, I don't think.
Q. Did you have any involvement with any of the garnishment proceedings or collection efforts by Clarinda as it related to Stearns Bank?
A. No.
Q. Have you been involved with the liquidation or the closing down of the Great Graphx business?
A. Yes. I would say, you know, I helped Mark clean up the space. I talked to his landlord there about the fact that he was moving and, of course, I then filed an eviction proceeding which I think we gave you a copy of, and I certainly helped him clean up. Yes.
Q. Have you negotiated with any of Great Graphx vendors or suppliers --
A. No.
Q. -- with respect to their claims of money?
A. No.

Q. Are you familiar with the basis for the $69,000 as stated in accounts payable?
A. Not other than it's on this thing here. Well, I don't know what you mean by the 69,000. Is that -- well, no.
Q. Did you participate at all in the formation of the entity known as Video Division, Inc.?
A. I remember a discussion about it. I don't recall that I had any participation in it.
Q. Who had a discussion about it?
A. I talked with Mark and I think then maybe Mark told me that he had talked to counsel about -- about it, but no.
Q. And what was the conversation that you had with Mark about it?
A. Almost exactly what you said, you know. Almost exactly -- you know, Mark said and the attorney is advising me to do whatever, so I didn't really -- I didn't get into it.
Q. What did Mark say was the reason he was setting up this account?
A. You know, he didn't. He didn't say this is why I wanted to do this or whatever. I assumed -- I didn't know what you were going to be doing. I mean, in terms of -- I assume that if you felt the

accounts receivable from Great Faces -- Great Graphx were yours, you would have taken them on July 15th. I mean, that's what I assumed.

Q. So Video Division, Inc. was an attempt to hide those assets from Clarinda?

A. No. I don't think so. I'm surmising that ACRO wanted to -- for reasons which as we talked about earlier, maybe might be hard to figure out, but I think ACRO wanted to make sure that bills got paid and there was a chance for the company to proceed because they had funded Paige and our counsel or Paige and her firm to file whatever motion they filed and didn't -- didn't succeed at, so I think they felt there was an interim period there where they were hoping that something good would happen and Great Graphx would be allowed to keep on going. I think that's what they thought.

Q. This was after we had seized half the equipment in the place?

A. Right.

Q. They felt like there was still a basis for it to go forward?

A. Well, I think so because you didn't take every last piece of it. You -- it seemed like you were taking the stuff you felt you had a right to under the

STATE OF MINNESOTA )
) ss
COUNTY OF RAMSEY )

BE IT KNOWN THAT I, Christina M. De Grande, the undersigned, a duly commissioned and qualified notary public within and for the County and State aforesaid, do hereby certify that before the giving of his deposition, the said Brian Nelson was by me first duly sworn upon his oath to depose the whole truth and nothing but the truth; that the foregoing is a true and correct copy of my original stenotype notes taken at said deposition; that I am neither a relative of, nor attorney for, any of the parties to the cause and have no interest whatsoever in the result of the same; that the cost of the original has been charged to the party who noticed the deposition, and that all parties who ordered copies have been charged at the same rate for such copies.

WITNESS MY HAND AND SEAL this 7th day of February, 2004.

CHRISTINA M. DE GRANDE
Notary Public, Ramsey County, Minnesota

Christina Marie DeGrande
Notary Public
Minnesota
My Commission Expires Jan. 31, 2008

# Exhibit F

Not Filed
Tracked as DV of GGX

**STATE OF MINNESOTA**
**SECRETARY OF STATE**

**ARTICLES OF INCORPORATION**
**Business and Nonprofit Corporations**

PLEASE TYPE OR PRINT LEGIBLY IN BLACK INK.

Please read the directions on the reverse side before completing this form. All information on this form is public information.

The undersigned incorporator(s) is an (are) individual(s) 18 years of age or older and adopt the following articles of incorporation to form a (mark ONLY one):

[X] FOR-PROFIT BUSINESS CORPORATION (Chapter 302A) [ ] NONPROFIT CORPORATION (Chapter 317A)

## *ARTICLE I NAME*

The name of the corporation is:
Video Division Inc.

(Business Corporation names must include a corporate designation such as Incorporated, Corporation, Company, Limited or an abbreviation of one of those words.)

## *ARTICLE II REGISTERED OFFICE ADDRESS AND AGENT*

The registered office address of the corporation is:
9555 James Ave South - 218 Bloomington MN 55431

(A complete street address or rural route and rural route box number is required; the address cannot be a P.O. Box) City State Zip

The registered agent at the above address is:

Name (Note: You are not required to have a registered agent.)

## *ARTICLE III SHARES*

The corporation is authorized to issue a total of 4000 shares.
(If you are a business corporation you must authorize at least one share. Nonprofit corporations are not required to have shares.)

## *ARTICLE IV INCORPORATORS*

I (We), the undersigned incorporator(s) certify that I am (we are) authorized to sign these articles and that the information in these articles is true and correct. I (We) also understand that if any of this information is intentionally or knowingly misstated that criminal penalties will apply as if I (we) had signed these articles under oath. (Provide the name and address of each incorporator. Each incorporator must sign below. List the incorporators on an additional sheet if you have more than two incorporators.)

| Name | Street | City | State | Zip | Signature |
|---|---|---|---|---|---|
| Great Graphx | 9555 James Ave South | Bloomington | MN | 55431 | |
| | | | | | |

Print name and phone number of person to be contacted if there is a question about the filing of these articles.

Name: [signature] Pres    Phone Number: (952) 888-6228

bus 3 Rev. 3-03

PHONE NO. :

# Exhibit G

STEARNS BANK - EDINA OFFICE
7300 FRANCE AVE SO SUITE 115
EDINA MN 55435

PHONE:952-893-7945

30
6
15

GREAT GRAPHX.COM INC
9555 JAMES AVE S STE 218
BLOOMINGTON MN 55431-2542

BUSINESS BEST
ACCOUNT: 5005644

07/01/04 THRU 07/30/04
DOCUMENT COUNT: 21
PAGE 1

BUSINESS BEST ACCOUNT 5005644

| | | | |
|---|---|---|---|
| | | LAST STATEMENT 06/30/04 | 397.44 |
| MINIMUM BALANCE | 1,400.48- | 10 CREDITS | 21,212.84 |
| AVG AVAILABLE BALANCE | 1,401.53 | 31 DEBITS | 21,478.98 |
| | | THIS STATEMENT 07/30/04 | 131.30 |

- - - - - - - - - - DEPOSITS - - - - - - - - - -

| REF # | DATE | AMOUNT | REF # | DATE | AMOUNT | REF # | DATE | AMOUNT |
|---|---|---|---|---|---|---|---|---|
| | 07/02 | 2,696.39 | | 07/13 | 12,840.01 | | 07/27 | 1,574.21 |
| | 07/09 | 100.00 | | 07/16 | 2,125.00 | | 07/28 | 90.00 |

- - - - - - - - OTHER CREDITS - - - - - - - - -

| DESCRIPTION | DATE | AMOUNT |
|---|---|---|
| RETURNED CHECK# 3552, INSUFFICIENT FUNDS | 07/21 | 372.60 |
| RETURNED CHECK# 3557, INSUFFICIENT FUNDS | 07/21 | 1,027.88 |
| RETURNED ITEM, INSUFFICIENT FUNDS | 07/26 | 14.15 |
| RETURNED CHECK# 3552, INSUFFICIENT FUNDS | 07/26 | 372.60 |

- - - - - - - - - - CHECKS - - - - - - - - - -

| CHECK # | DATE | AMOUNT | CHECK # | DATE | AMOUNT | CHECK # | DATE | AMOUNT |
|---|---|---|---|---|---|---|---|---|
| 3540* | 07/01 | 254.25 | 3548 | 07/16 | 1,865.00 | 3554 | 07/15 | 3,228.58 |
| 3542 | 07/02 | 662.38 | 3549 | 07/16 | 2,235.00 | 3555 | 07/14 | 1,600.00 |
| 3543* | 07/08 | 500.00 | 3550 | 07/15 | 1,250.13 | 3556 | 07/19 | 220.08 |
| 3545 | 07/08 | 398.72 | 3551 | 07/16 | 2,137.58 | 3557* | 07/20 | 1,027.88 |
| 3546 | 07/12 | 800.00 | 3552* | 07/20 | 372.60 | 3557 | 07/26 | 1,027.88 |
| 3547 | 07/08 | 426.89 | 3552* | 07/23 | 372.60 | | | |

(*) INDICATES A GAP IN CHECK NUMBER SEQUENCE

- - - - - - - - - OTHER DEBITS - - - - - - - - -

| DESCRIPTION | DATE | AMOUNT |
|---|---|---|
| TRANSFER TO BUSINESS BEST ACCOUNT 5005484 | 07/01 | 6.09 |
| FEDERAL EXPRESS DEBIT 244905463 | 07/02 | 74.56 |
| FEDERAL EXPRESS DEBIT 244905463 | 07/09 | 15.37 |
| GARNISHMENT SUMMONS DATED 6/30/04 | 07/13 | 1,000.36 |
| FEDERAL EXPRESS DEBIT 244905463 | 07/16 | 20.14 |
| GARNISHMENT SUMMONS ON ACCOUNT | 07/19 | 1,463.71 |
| NSF/OVERDRAFT CHARGE | 07/21 | 42.00 |
| FEDERAL EXPRESS DEBIT 244905463 | 07/23 | 14.15 |

* * * C O N T I N U E D * * *

STEARNS BANK - EDINA OFFICE
7300 FRANCE AVE SO SUITE 119
EDINA MN 55435

PHONE:952-893-7945

30
6
15

GREAT GRAPHX.COM INC
9555 JAMES AVE S STE 218
BLOOMINGTON MN 55431-2542

BUSINESS BEST
ACCOUNT: 5005644

07/01/04 THRU 07/30/04
DOCUMENT COUNT: 21
PAGE 2

BUSINESS BEST ACCOUNT 5005644

- - - - - - - - - - OTHER DEBITS - - - - - - - - - -

| DESCRIPTION | DATE | AMOUNT |
|---|---|---|
| NSF/OVERDRAFT CHARGE | 07/26 | 42.00 |
| INTERNET ACCESS FEE | 07/27 | 10.00 |
| MISCELLANEOUS DEBIT | 07/27 | 372.60 |
| FEDERAL EXPRESS DEBIT 244905463 | 07/28 | 14.15 |
| SERVICE CHARGE | 07/30 | 9.93 |
| FEDERAL EXPRESS DEBIT 244905463 | 07/30 | 14.35 |

- - - - - - - - DAILY BALANCE - - - - - - - -

| DATE | BALANCE | DATE | BALANCE | DATE | BALANCE |
|---|---|---|---|---|---|
| 07/01 | 137.10 | 07/14 | 10,295.22 | 07/23 | 428.75- |
| 07/02 | 2,096.55 | 07/15 | 5,816.51 | 07/26 | 1,111.88- |
| 07/08 | 770.94 | 07/16 | 1,683.79 | 07/27 | 79.73 |
| 07/09 | 855.57 | 07/19 | .00 | 07/28 | 155.58 |
| 07/12 | 55.57 | 07/20 | 1,400.48- | 07/30 | 131.30 |
| 07/13 | 11,895.22 | 07/21 | 42.00- | | |

STEARNS BANK - EDINA OFFICE
7300 FRANCE AVE SO SUITE 105
EDINA MN 55435

PHONE:952-893-7945

30
3
3

GREAT GRAPHX.COM INC
9555 JAMES AVE S STE 218
BLOOMINGTON MN 55431-2542

BUSINESS BEST
ACCOUNT: 5005644

07/31/04 THRU 08/31/04
DOCUMENT COUNT: 6
PAGE 1

BUSINESS BEST ACCOUNT 5005644

| | | | | |
|---|---|---|---|---|
| | | LAST STATEMENT 07/30/04 | | 131.30 |
| MINIMUM BALANCE | 22.38 | 3 CREDITS | | 992.15 |
| AVG AVAILABLE BALANCE | 185.16 | 9 DEBITS | | 1,108.08 |
| | | THIS STATEMENT 08/31/04 | | 15.37 |

- - - - - - - - - - DEPOSITS - - - - - - - - - -

| REF # | DATE | AMOUNT | REF # | DATE | AMOUNT | REF # | DATE | AMOUNT |
|---|---|---|---|---|---|---|---|---|
| | 08/03 | 125.00 | | 08/18 | 450.00 | | 08/23 | 417.15 |

- - - - - - - - - - CHECKS - - - - - - - - - -

| CHECK # | DATE | AMOUNT | CHECK # | DATE | AMOUNT | CHECK # | DATE | AMOUNT |
|---|---|---|---|---|---|---|---|---|
| 3559 | 08/03 | 102.38 | 3560* | 08/13 | 75.00 | 3562 | 08/24 | 427.12 |

(*) INDICATES A GAP IN CHECK NUMBER SEQUENCE

- - - - - - - - - - OTHER DEBITS - - - - - - - - - -

| DESCRIPTION | DATE | AMOUNT |
|---|---|---|
| TRANSFER TO BUSINESS BEST ACCOUNT 5005484 | 08/02 | 6.10 |
| garnishment summons | 08/03 | 22.82 |
| FEDERAL EXPRESS DEBIT 244905463 | 08/23 | 40.10 |
| INTERNET ACCESS FEE | 08/25 | 10.00 |
| NSP PAYBYPHONE 0100663027 | 08/25 | 417.55 |
| SERVICE CHARGE | 08/31 | 7.01 |

- - - - - - - - - DAILY BALANCE - - - - - - - - -

| DATE | BALANCE | DATE | BALANCE | DATE | BALANCE |
|---|---|---|---|---|---|
| 08/02 | 125.20 | 08/18 | 500.00 | 08/25 | 22.38 |
| 08/03 | 125.00 | 08/23 | 877.05 | 08/31 | 15.37 |
| 08/13 | 50.00 | 08/24 | 449.93 | | |

# Exhibit H

201 09 01

STEARNS BANK - EDINA OFFICE
7300 FRANCE AVE SO SUITE 115
EDINA MN 55435

PHONE:952-893-7945

30
1
3

VIDEO DIVISION INC
PO BOX 75515
SAINT PAUL MN 55175

BUSINESS BEST
ACCOUNT: 5005951

07/28/04 THRU 07/30/04
DOCUMENT COUNT: 4
PAGE 1

BUSINESS BEST ACCOUNT 5005951

| | | | |
|---|---|---|---|
| | | LAST STATEMENT 07/28/04 | .00 |
| MINIMUM BALANCE | 214.71 | 1 CREDITS | 5,441.48 |
| AVG AVAILABLE BALANCE | 2,828.09 | 3 DEBITS | 5,226.77 |
| | | THIS STATEMENT 07/30/04 | 214.71 |

---------- DEPOSITS ----------

| REF # | DATE | AMOUNT | REF # | DATE | AMOUNT | REF # | DATE | AMOUNT |
|---|---|---|---|---|---|---|---|---|
| | 07/28 | 5,441.48 | | | | | | |

---------- CHECKS ----------

| CHECK # | DATE | AMOUNT | CHECK # | DATE | AMOUNT | CHECK # | DATE | AMOUNT |
|---|---|---|---|---|---|---|---|---|
| * | 07/30 | 1,269.57 | * | 07/30 | 1,865.00 | | 07/30 | 2,092.20 |

(*) INDICATES A GAP IN CHECK NUMBER SEQUENCE

-------- DAILY BALANCE --------

| DATE | BALANCE | DATE | BALANCE | DATE | BALANCE |
|---|---|---|---|---|---|
| 07/28 | 5,441.48 | 07/30 | 214.71 | | |

201 09 01

STEARNS BANK - EDINA OFFICE
7300 FRANCE AVE SO SUITE 115
EDINA MN 55435

PHONE:952-893-7945

30
4
7

VIDEO DIVISION INC
PO BOX 75515
SAINT PAUL MN 55175

BUSINESS BEST
ACCOUNT: 5005951

07/31/04 THRU 08/31/04
DOCUMENT COUNT: 11
PAGE 1

BUSINESS BEST ACCOUNT 5005951

| | | | |
|---|---|---|---|
| | | LAST STATEMENT 07/30/04 | 214.71 |
| MINIMUM BALANCE | 46.76 | 4 CREDITS | 5,898.50 |
| AVG AVAILABLE BALANCE | 551.92 | 9 DEBITS | 6,073.57 |
| | | THIS STATEMENT 08/31/04 | 39.64 |

DEPOSITS

| REF # | DATE | AMOUNT | REF # | DATE | AMOUNT | REF # | DATE | AMOUNT |
|---|---|---|---|---|---|---|---|---|
| | 08/03 | 267.73 | | 08/11 | 218.33 | | | |
| | 08/04 | 1,412.44 | | 08/16 | 4,000.00 | | | |

CHECKS

| CHECK # | DATE | AMOUNT | CHECK # | DATE | AMOUNT | CHECK # | DATE | AMOUNT |
|---|---|---|---|---|---|---|---|---|
| * | 08/03 | 225.00 | 3004 | 08/30 | 100.00 | 3007 | 08/16 | 125.00 |
| * | 08/06 | 1,000.00 | 3005 | 08/18 | 450.00 | | | |
| * | 08/12 | 482.77 | 3006 | 08/18 | 3,500.00 | | | |

(*) INDICATES A GAP IN CHECK NUMBER SEQUENCE

OTHER DEBITS

| DESCRIPTION | DATE | AMOUNT |
|---|---|---|
| DELUXE BUS SYS. BUS PRODS 15291332 | 08/03 | 183.68 |
| SERVICE CHARGE | 08/31 | 7.12 |

DAILY BALANCE

| DATE | BALANCE | DATE | BALANCE | DATE | BALANCE |
|---|---|---|---|---|---|
| 08/03 | 73.76 | 08/11 | 704.53 | 08/18 | 146.76 |
| 08/04 | 1,486.20 | 08/12 | 221.76 | 08/30 | 46.76 |
| 08/06 | 486.20 | 08/16 | 4,096.76 | 08/31 | 39.64 |

[redacted]

ASSOCIATED BANK
MINNESOTA
17-127-910

20962

| CHECK NO. | CHECK DATE | VENDOR NO. |
|---|---|---|
| 20962 | 07/26/04 | G110 |

CHECK AMOUNT
$ 2,036.09

Two Thousand Thirty Six & 09/100 Dollars

REGISTERED
8U5913S 2036.09

PAY TO THE ORDER OF
Great Graphx.com Corp.
PO Box 75515-0515
St. Paul, MN 55175-0515

Security Features Included. Details on back.

⑈020962⑈ ⑆091001270⑆ 0000 043 851⑈ ⑈0000203609⑈



[redacted]

ASSOCIATED BANK
MINNESOTA
17-127-910

20947

| CHECK NO. | CHECK DATE | VENDOR NO. |
|---|---|---|
| 20947 | 07/13/04 | G110 |

CHECK AMOUNT
$ 993.16

Nine Hundred Ninety Three & 16/100 Dollars

REGISTERED
8U5913S 993.16

PAY TO THE ORDER OF
Great Graphx.com Corp.
PO Box 75515-0515
St. Paul, MN 55175-0515

Security Features Included. Details on back.

⑈020947⑈ ⑆091001270⑆ 0000 043 851⑈ ⑈0000099316⑈

MORRIS & COMPANY
3433 BROADWAY ST NE, STE 455
MINNEAPOLIS, MN 55413
(612) 379-8100

WESTERN BANK
MINNEAPOLIS, MN 55414
22-66/960

33719

7/19/04

PAY TO THE ORDER OF Great Graphix $ $410.03

Four Hundred Ten and 03/100 Dollars DOLLARS

Great Graphix
P O Box 75515-0515
St Paul, MN 55175-0515

MEMO Payment; Great Graphix

⑈033719⑈ ⑆096000661⑆ 3412940⑈ ⑈0000041003⑈



CREATIVE FREEDOM, INC.
DENISE H. BERGEN
DAVID M. SCHMIT
6200 S. LINWOOD DRIVE, NE 651-462-4513
LINWOOD LAKE, MN 55092

17-15/910
3973078369

6584

Date 7-20-04

Pay to the Order of Great Graphix $ 2202.20

two thousand two and 20/100 Dollars

NORWEST BANKS
Norwest Bank Minnesota, N.A.
Minneapolis, MN 55479
612-657-9278

Memo Hunt catalog

⑆091000019⑆ 3973078369⑈06584 ⑈0000220220⑈

75-1015,

Video Division Inc.

DATE 7-28-04

DEPOSITS MAY NOT BE AVAILABLE FOR IMMEDIATE WITHDRAWAL

| | |
|---|---|
| | 2002.20 |
| | 2036.09 |
| | 993.16 |
| SUB TOTAL | 41003 |
| LESS CASH RECEIVED | 5,441.48 |
| $ | 5441.48 |

STEARNS Bank N.A.

CkDepNew
07/28/2004 12:11:35 PM
0007 4136 0032 #11

5005951

⑆091910455⑆ ⑈500 595 1⑈ 009 ⑈0000544148⑈

# Exhibit I

# CORPORATE BANKING RESOLUTION

## (for Deposit Accounts)

**Depositor:** Video Division Inc.
PO Box 75515
St. Paul, MN 55175
**Account No:** 5005951

**Financial Institution:** STEARNS BANK NA EDINA
7300 FRANCE AVE S SUITE 115
EDINA, MN 55435

**I, the undersigned Secretary of the Corporation named above, HEREBY CERTIFY** that the Corporation is organized and existing under and by virtue of the laws of the state of **Minnesota** as a corporation for profit, with its principal office at **PO Box 75515, St. Paul, MN 55175.**

**Account Holder. Video Division Inc.** is the complete and correct name of the Account Holder.

**I FURTHER CERTIFY** that at a meeting of the Board of Directors of the Corporation, duly and regularly called and held on ______________________________, at which a quorum was present and voting, the following resolutions were adopted:

**RESOLVED**, that the Financial Institution named above at any one or more of its offices or branches, be and it hereby is designated as a depository for the funds of this Corporation, which may be withdrawn on checks, drafts, advices of debit, notes or other orders for the payment of monies bearing the following appropriate number of signatures: Any **one** (1) of the following named officers or employees of this Corporation ("Agents"), whose actual signatures are shown below:

X ______________________________
**Mark Nelson, President of Video Division Inc.**

and that the Financial Institution shall be and is authorized to honor and pay the same whether or not they are payable to bearer or to the individual order of any Agent or Agents signing the same.

**FURTHER RESOLVED**, that the Financial Institution is hereby directed to accept and pay without further inquiry any item drawn against any of the Corporation's accounts with the Financial Institution bearing the signature or signatures of Agents, as authorized above or otherwise, even though drawn or endorsed to the order of any Agent signing or tendered by such Agent for cashing or in payment of the individual obligation of such Agent or for deposit to the Agent's personal account, and the Financial Institution shall not be required or be under any obligation to inquire as to the circumstances of the issue or use of any item signed in accordance with the resolutions contained herein, or the application or disposition of such item or the proceeds of the item.

**FURTHER RESOLVED**, that any one of such Agents is authorized to endorse all checks, drafts, notes and other items payable to or owned by this Corporation for deposit with the Financial Institution, or for collection or discount by the Financial Institution; and to accept drafts and other items payable at the Financial Institution.

**FURTHER RESOLVED**, that the above named agents are authorized and empowered to execute such other agreements, including, but not limited to, special depository agreements and arrangements regarding the manner, conditions, or purposes for which funds, checks, or items of the Corporation may be deposited, collected, or withdrawn and to perform such other acts as they deem reasonably necessary to carry out the provisions of these resolutions. The other agreements and other acts may not be contrary to the provisions contained in this Resolution.

**FURTHER RESOLVED**, that the authority hereby conferred upon the above named Agents shall be and remain in full force and effect until written notice of any amendment or revocation thereof shall have been delivered to and received by the Financial Institution at each location where an account is maintained. Financial Institution shall be indemnified and held harmless from any loss suffered or any liability incurred by it in continuing to act in accordance with this resolution. Any such notice shall not affect any items in process at the time notice is given.

**I FURTHER CERTIFY** that the persons named above occupy the positions set forth opposite their respective names and signatures; that the foregoing Resolutions now stand of record on the books of the Corporation; that they are in full force and effect and have not been modified in any manner whatsoever.

**IN TESTIMONY WHEREOF, I have hereunto set my hand on ______________________________, 2004 and attest that the signatures set opposite the names listed above are their genuine signatures.**

**CERTIFIED TO AND ATTESTED BY:**

**CORPORATE SEAL**

X ______________________________
***Secretary or Assistant Secretary**

X ______________________________
**Co- *Secretary or Assistant Secretary**

*NOTE: In case the Secretary or other certifying officer is designated by the foregoing resolutions as one of the signing officers, this certificate should also be signed by a second Officer or Director of the Corporation.

EXPORT PRO, Ver. 5.?? ??? Copr. Harland Financial Solutions, Inc. 1996, 2004. All Rights Reserved MN - MN - F:\HFS\CFI\TKCL?10 TR-173

**STEARNS BANK NA EDINA** **5005951**

**Account Purpose:** Non Consumer

Account Holder Name(s): **Video Division Inc.**

Reporting SSN/TIN: 20-1418088
Mailing Address: PO Box 75515, St. Paul, MN 55175
Street Location: PO Box 75515, St. Paul, MN 55175
Telephone Number: (952) 888-8935 Work #:
Number of Signatures Required: 1 CIF Number:

| ACCOUNT TYPE BUSINESS BEST | | ACCOUNT NUMBER 5005951 | |
|---|---|---|---|
| Date Opened 07-28-04 | Date Revised | Opened By JAMEANEG | Verified By CHECK SYSTEMS |

BUSINESS TYPE: Corporation

Signatures of Authorized Individuals. This Agreement is subject to all terms below.

X [signature]
Mark Nelson - President of Video Division Inc.

**(Signatures and printed names of each account signer)**

The authorized Agent(s) signing above agree(s), that the Corporation's Account(s) will be governed by the terms set forth in the Deposit Account Agreement and Disclosure, the Time Certificate of Deposit or Confirmation of Time Deposit Agreement (if applicable), the Rate and Fee Schedule, the Funds Availability Policy Disclosure, the Electronic Funds Transfer Agreement and Disclosure, (if applicable), and acknowledge receipt of our privacy policy (if applicable), as amended by the Financial Institution from time to time. The authorized Agent(s) also acknowledge that they have received at least one copy of these deposit account documents. The Authorized Signer(s) understand(s) accounts opened after 4:00 PM are dated effective the next business day.

**TIN/BACKUP WITHHOLDING** Reporting TIN: 20-1418088

**Important:** Under penalties of perjury, I certify that the number shown above is the Corporation's correct taxpayer identification number, I am a U.S. person (including a U.S. resident alien), and that (check appropriate box):

☒ The Corporation is not subject to backup withholding, because the Corporation is exempt from backup withholding, or because the Corporation has not been notified by the IRS that the Corporation is subject to backup withholding as a result of failure to report all interest or dividends, or because the IRS has notified the Corporation that the Corporation is no longer subject to backup withholding.

☐ The Corporation is subject to backup withholding.

Signature of Authorized Individual: X [signature] 7/28/04
Date

The following information may be used to further identify individual(s) for telephone instructions, large transactions, or if a signature varies.
MMN=Mother's Maiden Name

Name: Mark Nelson
Street: PO Box 1262, Lakeville, MN 55044 SSN: 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
Mailing:
Phone: (H): (952) 461-5201 (W):
Job:
DOB: Grantsburg, WI
ID: Drivers License N-425-585-661-060 MMN: Simonson

Video division Inc.

FROM : PHONE NO. : Aug. 26 2004 09:01AM P2

**STATE OF MINNESOTA**
**SECRETARY OF STATE**

**ARTICLES OF INCORPORATION**
**Business and Nonprofit Corporations**

PLEASE TYPE OR PRINT LEGIBLY IN BLACK INK.

Please read the directions on the reverse side before completing this form. All information on this form is public information.

The undersigned incorporator(s) is an (are) individual(s) 18 years of age or older and adopt the following articles of incorporation to form a (mark ONLY one):

[X] FOR-PROFIT BUSINESS CORPORATION (Chapter 302A) [ ] NONPROFIT CORPORATION (Chapter 317A)

## ARTICLE I NAME

The name of the corporation is:
Video Division Inc.

(Business Corporation names must include a corporate designation such as Incorporated, Corporation, Company, Limited or an abbreviation of one of those words.)

## ARTICLE II REGISTERED OFFICE ADDRESS AND AGENT

The registered office address of the corporation is:
9555 James Ave South - 218 Bloomington MN 55431

(A complete street address or rural route and rural route box number is required; the address cannot be a P.O. Box) City State Zip

The registered agent at the above address is:

Name (Note: You are not required to have a registered agent.)

## ARTICLE III SHARES

The corporation is authorized to issue a total of 4000 shares.
(If you are a business corporation you must authorize at least one share. Nonprofit corporations are not required to have shares.)

## ARTICLE IV INCORPORATORS

I (We), the undersigned incorporator(s) certify that I am (we are) authorized to sign these articles and that the information in these articles is true and correct. I (We) also understand that if any of this information is intentionally or knowingly misstated that criminal penalties will apply as if I (we) had signed these articles under oath. (Provide the name and address of each incorporator. Each incorporator must sign below. List the incorporators on an additional sheet if you have more than two incorporators.)

Great Graphx 9555 James Ave South Bloomington MN 55431

Name Street City State Zip Signature

Name Street City State Zip Signature

Print name and phone number of person to be contacted if there is a question about the filing of these articles.

[signature] (952) 888-6228

Name Phone Number

Sos 3 Rev. 3.03

Aug. 26 2004 08:43AM P3 PHONE NO. : FROM :

Internal Revenue Service The Digital Daily
DEPARTMENT OF THE TREASURY

# Federal Tax ID / EIN

This is your provisional Employer Identification Number:

**20-1418088**

Today's Date is: July 28, 2004 GMT

You will receive a confirmation letter in U.S. mail within fifteen days.

The letter will also contain useful tax information for your business or organization.

If you have input any of the information on your application in error, please wait seven days and contact the EIN Toll Free area at 1-800-829-4933, Monday - Friday, 7:30am - 5:30pm. If you do not want to call, please make corrections on the letter you receive confirming your EIN and return it to the IRS.

If you are going to complete other on-line applications that require your Employer Identification Number(EIN) you can copy it by performing the following steps:

1) Use your mouse to highlight your EIN (blue number on top of page) by moving your pointer on top of the number.
2) Press the Ctrl key at the same time pressing the C key.

Once you copy your EIN you can paste it in the appropriate place by pressing the Ctrl key at the same time pressing the V key.

You may click on the buttons below for different print options or to fill out another Form SS-4.

Review and Print Form SS-4 Fill Out Another Form SS-4

Click here to return to the Internet Employer Identification Number landing (start) page.

Video Division Inc.

# Exhibit J

**WORKOUT AGREEMENT**

January 24, 2003

ACRO Business Finance Corp. ("ACRO")
4725 Olson Memorial Highway, Suite 201
Minneapolis, MN 55422

Dear Sir:

The undersigned is a guarantor of obligations payable to ACRO from **Great Graphx.com, Inc.**, a Minnesota corporation (hereinafter referred to as the "Borrower"). The undersigned recognizes that ACRO's decision to enter into financing arrangements with the Borrower pursuant to that certain Revolving Loan and Security Agreement dated on or about the date hereof between the Borrower and ACRO ("Loan Agreement") is based, in part, upon the undersigned's agreement to continue to be active monitoring the affairs of the Borrower. The undersigned therefore agrees that he will take all necessary steps to protect the Collateral (as defined in the Loan Agreement) and agrees to keep ACRO informed in the event that the undersigned learns of a default or event of default under the Loan Agreement.

The undersigned represents that the undersigned's present level of compensation is limited to Borrower provided standard health and related fringe benefits. During the period of the undersigned's employment with the Borrower, and so long as there is outstanding any Obligation to ACRO, the undersigned agrees not to request or accept any increase in the level of compensation, except as increased or adjusted to reflect changes in cost of living as reported in the Consumer Price Index, or any material increase in fringe benefits associated with the undersigned's employment with Borrower, without the written consent of ACRO.

The undersigned also agrees that upon an Event of Default under the Loan Agreement, the undersigned will (at ACRO's option) provide services to ACRO for the sole purpose of disposing of ACRO's Collateral. During such period, the undersigned shall devote required working hours and exert all of the undersigned's efforts to dispose of inventory, collect accounts receivable, and otherwise dispose of or realize value on the Collateral at the best obtainable prices and terms. ACRO shall have the right to discharge the undersigned from that arrangement at any time, on five (5) business days' notice, for any cause or without cause. The sole compensation and remuneration for such services shall be a retainer of $1,500.00 plus $1,500 payable monthly in arrears, prorated for any partial period of the month. During such employment, the undersigned shall not have any authority to bind ACRO, except for such specific authority as ACRO may grant in writing. No partnership, joint venture or implied agency agreement shall be created as a result of the terms hereof and at all times ACRO may act in connection with the Collateral as it may determine in the exercise of its sole discretion. Except for any specific authority granted by ACRO, the undersigned shall not represent to any third party that the undersigned has any authority during such period to bind ACRO in any respect.

Nothing herein contained shall be in any way impaired or affected by any change in or amendment of the Loan Agreement or any of the documents evidencing the financing arrangements.

The liability of the undersigned hereunder is direct and unconditional, and may be enforced without requiring ACRO first to resort to any other right, remedy or security. It is not necessary for ACRO to give the undersigned notice of any changes in any of its financing arrangements with the Borrower, to all of which the undersigned now hereby consents. All capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Loan Agreement.

Very truly yours,

Brian R. Nelson

2400 Bryant Ave. South

Address

Minneapolis, MN 55405

Accepted by:

ACRO BUSINESS FINANCE CORP.

By: Jack L. Hart, President

Great Graphx.com, Inc., a Minnesota corporation referred to in the foregoing Liquidation Agreement as "Borrower", hereby acknowledges receipt and review of the foregoing Liquidation Agreement and, with the advice of counsel, hereby agrees and consents to the above named individual entering into and performing under the foregoing Liquidation Agreement.

Great Graphx.com, Inc., a Minnesota corporation

By: Mark Nelson, President

Brian Nelson workout letter (00211952;2).WPD